UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LESLEE S. DAVIS, M.D.,

     Plaintiff,

v.                                                                    Case No: 6:23-cv-68-JSS-DCI

DOUGLAS A. COLLINS,

     Defendant.

_____/

## ORDER

    Plaintiff, Leslee S. Davis, M.D., and Defendant, Douglas A. Collins, the Secretary of the United States Department of Veterans Affairs, have filed cross-motions for summary judgment. (Dkts. 49, 50; *see* Dkts. 53, 54, 57, 58.)[1] Upon consideration, for the reasons outlined below, Plaintiff's motion is denied, and Defendant's motion is granted.

## BACKGROUND

    Plaintiff is an African American physician who was employed by the United States Department of Veterans Affairs (VA). (Dkt. 50-2 at 2.) She worked directly for the VA's Orlando Medical Center beginning in March 2008. (*Id.*) In 2015, she was

---

[1] When this case began, Denis R. McDonough was the Secretary of the United States Department of Veterans Affairs. During the pendency of this case, Douglas A. Collins was appointed as Secretary. The court therefore has substituted as Defendant the proper individual in his official capacity. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. Later proceedings should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

promoted to primary care section chief of the Lake Baldwin Outpatient Medical Campus, which placed her in charge of twenty-eight to thirty-four healthcare providers. (*Id.* at 3.)  Plaintiff was demoted from her supervisory position in March 2020. (*Id.* at 12.)  She filed this action against Defendant alleging claims of race discrimination and retaliation in violation of Title VII. (*See* Dkt. 1 at 16–19 (citing 42 U.S.C. §§ 2000e-2(a), 2000e-3(a)).)

The employees at Lake Baldwin appear to have suffered from unresolved interpersonal issues.  An administrative investigation board (AIB) was empaneled in late 2016 due to a dispute that occurred between Dr. Andrea Buckley, Plaintiff's direct supervisor and Lake Baldwin's chief medical officer, and Stephen Sabol, an administrative officer. (*See* Dkt. 49-9 at 1–2; Dkt. 53-2 at 5.)  The AIB determined that "[t]he culture that exist[ed] among Lake Baldwin leadership c[ould] be characterized as non-communicative, tension-filled[,] and distrustful," and that this culture "contribute[d] to creating a hostile work environment." (Dkt. 49-9 at 3.)

Plaintiff maintains that there were no "interpersonal 'issues'" at Lake Baldwin—while she concedes that personnel problems did arise, she asserts that they "were resolved." (Dkt. 53-2 at 5–6.)  At the same time, she contends that Lake Baldwin's management structure was "siloed" such that she and Dr. Buckley "only exercised authority over the provider staff," (Dkt. 50-2 at 3–4), rather than authority over the entire facility, (*see* Dkt. 50-3 at 57).  Plaintiff asserts that this structural issue was exacerbated because Dr. Lisa Zacher, who served alternately as the Orlando VA's

chief of staff and acting medical center director,[2] and Dr. Yalamanchili, Plaintiff's second-level supervisor and the associate chief of staff for ambulatory care, "routinely ignored" Plaintiff's and Dr. Buckley's requests for assistance. (Dkt. 50-2 at 4.) Dr. Zacher declares that she felt that the doctors, nurses, and administrative staff "had difficulty working as a cohesive team" and suffered from "an us-against-them attitude in relation to their coworkers." (Dkt. 49-7 at 3.) Dr. Zacher further states that she believed that Lake Baldwin's "leadership was not effectively managing or mediating the interpersonal issues between staff." (*Id.*)

On June 5, 2019, Andy Gonzalez, the Orlando VA's facility harassment prevention program coordinator, issued a memorandum stating that he had "received an allegation of workplace harassment from EllaMay Artis" against her supervisor, Aveni Patel. (Dkt. 50-8 at 2; *see* Dkt. 50-11 at 2.) Dr. Jennifer Thompson, the associate chief of staff for education at the Orlando VA, declares that she requested that Plaintiff investigate Ms. Artis's allegations. (Dkt. 54-2 at 1.) Plaintiff states that she "reluctantly agreed." (Dkt. 50-2 at 6.)

According to James Leafgreen, a human resources (HR) representative, HR received a complaint regarding Plaintiff's conduct during her investigation. (Dkt. 54-3 at 10, 38–39.) Mr. Leafgreen testified that he was instructed to have a conversation

---

[2] Dr. Zacher was chief of staff from late 2015 until early 2019, when she became the acting medical center director. (Dkt. 54-4 at 10.) She held this position until mid-August 2019, when she resumed her role as chief of staff "for about another four weeks" before being named interim medical center director on September 1, 2019. (*Id.* at 10–11.) She remained interim director until late December 2019, when she once again resumed her role as chief of staff. (*Id.* at 11.)

with Plaintiff.  (*Id.* at 42.)  While Mr. Leafgreen stated that the conversation was concerning this complaint, (*id.* at 42–43), Plaintiff testified that he wanted to know what result Plaintiff intended on reaching in her forthcoming report, (Dkt. 49-4 at 213). Plaintiff claims that she told Mr. Leafgreen that her report was not ready, and that he then "demanded that [Plaintiff] say that there was no discrimination or retaliation." (*Id.*)  According to Plaintiff, he "yell[ed]" and "scream[ed]" at her, "treated [her] like [she] was stupid," and said that he "d[id not] . . . care if [Ms. Patel] [wa]s part of the KKK" because Ms. Patel had not harassed or retaliated against Ms. Artis.  (*Id.* at 213–14.)

Plaintiff emailed a report of Mr. Leafgreen's behavior to Dr. Zacher and Timothy Liezert, the medical center director, among others.  (Dkt. 50-12.)  She described the encounter as follows:

> Mr. Leafgreen told me in a very angry voice that all I need to do is determine if [Ms. Patel] committed harassment because she did her job. . . . I told him it was not that simple.  Mr. Leafgreen['s] voice got edgier and told me yes it is.  I told him I received instructions that asked me to evaluate harassment in the workplace based on certain criteria that occurred, and that was what I was doing. . . .  He told me I was not to look into [Ms. Patel]'s heart, head, or feelings.  He does not care if she is the KKK at all, all I was supposed to do [was] make the determination: Did [Ms. Patel] discriminate against [Ms. Artis] . . . .

(*Id.* at 3.)  She stated that she believed Mr. Leafgreen's intent "was to intimidate [her] and make sure [she] came up with the right result."  (*Id.*)  Mr. Liezert responded that he was "very sorry that this happened," assured Plaintiff that "[the] behavior w[ould]

be addressed," and commended her "integrity" and "character." (*Id.* at 2.)  Dr. Zacher declares that she saw Plaintiff's email and spoke with someone "to ensure th[e] incident was addressed" but was not otherwise involved in any follow-up.  (Dkt. 49-7 at 5.)  Mr. Leafgreen concedes that he made a statement referencing the KKK.  (Dkt. 54-3 at 81.)

Plaintiff ultimately determined that Ms. Artis "had suffered race- and retaliation-based harassment."  (Dkt. 50-2 at 7–8; *see* 50-11 at 11–12.)  Mr. Gonzalez testified that upon receipt of Plaintiff's report, he forwarded it to Dr. Zacher, Mr. Leafgreen, and Cory Price, who was the Orlando VA's associate director.  (Dkt. 53-14 at 6–8; Dkt. 50-2 at 6.)  Mr. Gonzalez further testified that someone—he could not remember who—determined that the fact finding "was not done correctly," such that a second fact finding was required.  (Dkt. 53-14 at 10–12.)  A second report was conducted by William Ragan, Ph.D., who concluded that Ms. Artis had not been subject to harassment.  (*See* Dkt. 50-39.)

Throughout the latter half of 2019, several other alleged incidents occurred that indicated the issues at Lake Baldwin.  One of these involved Mia Jenkins, a nurse manager with whom Plaintiff reported experiencing friction.  (Dkt. 50-2 at 4; *see* Dkt. 53-2 at 5–6 (Plaintiff's declaration that Ms. Jenkins "actively resisted collaboration" and "insisted on escalating even petty concerns").)  Plaintiff asserts that Ms. Jenkins "was causing havoc" by, among other things, issuing directives contrary to VA policies and "fomenting . . . nursing staff disrespect toward physicians."  (Dkt. 50-2 at 4.)  For example, Dr. Nafeesa Mahmood reported that Ms. Jenkins was instructing her nurses

to ignore certain responsibilities they held with regard to secure messaging. (Dkt. 49-13 at 1.) According to Plaintiff, a meeting was called in response to the complaints raised about Ms. Jenkins. (Dkt. 49-4 at 185–86.) Following this meeting, Ms. Jenkins complained that Dr. Mahmood and Plaintiff "slander[ed] [her] name" during the meeting by openly stating that she "d[id not] know how to manage her team" and was "ma[king] up rules to cause discord among the providers and nurses." (Dkt. 49-13 at 3.) She demanded that the "behavior be addressed," threatening to "file charges" if it was not. (*Id.*) Valerie Johnson, the chief nurse, issued a memorandum finding, after an investigation, that Ms. Jenkins's "allegation(s) of workplace harassment could not be substantiated." (Dkt. 49-24 at 1.)

In October 2019, Plaintiff declares, she met with Kevin Kolendo, Lake Baldwin's administrative officer, (Dkt. 49-28 at 3), to discuss the status of a construction project. (Dkt. 50-2 at 8; *accord* Dkt. 49-12 at 12–16.) Lisa Martel was present for the meeting. (*Id.*) Ms. Martel reported that they asked Mr. Kolendo whether he could provide assistance on the project, and that he responded that he had already sent an email related to the project but had not heard back. (Dkt. 49-12 at 16.) Ms. Martel stated that Plaintiff then told Mr. Kolendo he "might need to follow[ ]up," prompting Kolendo to "angrily state[], 'What! Are you saying that I'm not doing my job!? Don't speak to me like that!'" (*Id.*) Plaintiff, Mr. Kolendo, and Ms. Martel all filed reports regarding this incident. (*See id.* at 12–16.) Plaintiff claimed that Mr. Kolendo had acted aggressively, at one point taking a step toward her, such that she was left shaken and scared by the interaction. (*Id.* at 13–15.) She indicated that Ms.

Martel was a witness to the fact that she was distressed after the encounter, (*id.* at 14), but according to Ms. Martel, the whole situation was quickly defused and was resolved "without further incident," (*id.* at 16). Mr. Kolendo reported that Plaintiff had spoken to him "condescendingly in a hostile tone," and that in his over twenty years of federal service, he had "[never] . . . had an encounter like this, where [he] [was] . . . inappropriately and rudely disrespected in front of a coworker." (*Id.* at 12.)

While the parties dispute who was responsible for the issues at Lake Baldwin, there appears to be no dispute that the facility suffered from issues.[3] On October 1, 2019, Ms. Jenkins reported to Ms. Johnson that the "last strong nurse" on Ms. Jenkins's team had requested to transfer to a different facility after seeing Plaintiff and Dr. Mahmood celebrate having another nurse, Chenay Iousouph, removed from Dr. Mahmood's team. (Dkt. 49-20 at 2.) Plaintiff testified that she sought to have Ms. Iousouph transferred because Ms. Iousouph struck Dr. Mahmood. (Dkt. 50-3 at 64–65.) Ms. Johnson forwarded Ms. Jenkins's email to Margaret Givens, an associate director for patient care services. (Dkt. 49-20 at 1–2; Dkt. 49-26 at 1.) Ms. Johnson stated that Lake Baldwin needed improvement "ASAP," that "[t]he environment

---

[3] While Plaintiff testified that Lake Baldwin was "not anymore toxic than anyplace else," this testimony does not contradict the assertion that Lake Baldwin had issues. (Dkt. 49-4 at 153.) Moreover, she also testified that Lake Baldwin did have problems as a result of Dr. Yalamanchili and Dr. Zacher's lack of support. (*Id.* at 153–54 ("[W]e were a very well-run site. The only problem[] we had was our senior leadership not being supportive, meaning Dr[s]. Yalamanchili and Zacher. But we did the best we could under the circumstances.").) Similarly, although she declares that "[t]here were not interpersonal 'issues' at [Lake Baldwin]," she cites an incident in that same declaration as "another example of the dysfunction incident to the siloing approach to management." (Dkt. 53-2 at 5, 11.) *Cf. Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 837 (11th Cir. 1999) (determining that the district court's reliance on internally inconsistent affidavits was error).

[wa]s . . . toxic and detrimental to staff," and that she was "worr[ied]" about the "effect it [wa]s having on patient care." (Dkt. 49-20 at 2.) Ms. Givens responded that the situation was "unfortunate" and stated her belief that leadership needed "to intervene on behalf of the staff and the [v]eterans." (*Id.* at 1.) Ms. Johnson noted that there were conflicting stories as to what had happened, but she nevertheless reiterated that Lake Baldwin was "clearly a toxic environment with a lot of finger pointing" and that "leadership need[ed] to do something as soon as possible." (*Id.*)

That evening, Dr. Zacher separately emailed various HR personnel, scheduling a meeting to discuss an "AIB at Lake Baldwin looking into hostile work environment and leadership effectiveness." (Dkt. 49-25.) She testified that this AIB was the result of "events that happened over a several-month period." (Dkt. 54-4 at 67.) The following day, October 2, 2019, Ms. Givens forwarded Ms. Johnson's emails to Dr. Zacher. (Dkt. 49-20 at 1.) Dr. Zacher responded that "this behavior should not be tolerated," and that Plaintiff, "as a supervisor[,] should be held most accountable." (*Id.*) She stated that Plaintiff should be asked for "her side of events" but that "there should be at least a written counseling documenting the events witnessed and what effects [they were] having on staff." (*Id.*) She also noted that they should "not wait for the AIB" to investigate this incident because "[d]iscipline need[ed] to be proximate to the event." (*Id.*)

Kristina Morgan, an employee and labor relations specialist from outside the Orlando VA, declares that she assisted in organizing the AIB. (Dkt. 49-5 at 3.) She states that she recommended three panelists from a group of twenty volunteers:

Virginia Lyons, "a JD/RN [r]isk [m]anager," Joseph Scotchlas, "an administrative manager," and Christopher Schweighardt, who "was in a position of nursing leadership." (*Id.* at 3–4.) Mr. Leafgreen forwarded Ms. Morgan's recommendations to Dr. Zacher, who states that she was "concern[ed]" that the recommended panel "included two nurses and no person with experience as a supervisory doctor." (Dkt. 49-7 at 7.) Ms. Givens states that Dr. Zacher was especially concerned because the issues at Lake Baldwin involved "disputes between doctors and nurses" such that Dr. Zacher felt that having a "supervisory doctor" on the panel was important. (Dkt. 49-26 at 2.) She reportedly asked Ms. Givens for a substitute recommendation, and Ms. Givens suggested Dr. Coretta Murphy, who "had experience as a [chief medical officer] of an outpatient clinic in the North Florida/South Georgia VA" as well as "previous experience . . . participating in the AIB process." (*Id.*) Ultimately, Ms. Lyons, Mr. Scotchlas, and Dr. Murphy were selected as the AIB panelists. (Dkt. 49-7 at 7–8.)

The AIB was empaneled on October 31, 2019. (Dkt. 49-1.) In a memorandum outlining its scope, Dr. Zacher directed the panelists to "conduct a thorough investigation into the facts and circumstances regarding allegations of [a] hostile work environment at [Lake Baldwin]," "hostile work relationships across the staff (provider, nursing, [and] ancillary support)," and a "work environment that appears to lack the [VA's] expectation of psychological safety." (*Id.* at 1.) According to the memorandum, the object of the AIB was to furnish a report regarding three issues: (1) "whether allegations of a hostile environment . . . at Lake Baldwin . . . [we]re valid,"

- 9 -

(2) whether "management [was] effectively addressing and resolving issues in the work environment," and (3) whether "management [was] creating an effective, efficient[,] and psychologically safe environment for patient care and employees." (*Id.* at 2.) The memorandum did not reference Plaintiff or otherwise indicate that she was the subject of the AIB. (*See id. passim*.)

> Mr. Scotchlas provides the following summary of the typical AIB's process:
>
> > Upon receiving the charge letter . . ., the AIB met to discuss the charges and discuss amongst themselves what types of relevant documentation would aid in investigating the charges. These documents included organizational charts, previous fact[ ]findings . . . and complaints received by management. These documents were provided to the board via the administrative point of contact to the board. The board then reviews these documents and determines an interview schedule based upon the documents.

(Dkt. 54-8 at 3.)[4]  He notes that the AIB had the discretion to recall witnesses for additional testimony and to request additional documentation in response to testimony. (*Id.*) He further states that he "had no reason to believe that anyone outside the board members influenced which documents were received or which witnesses were interviewed" and that the AIB "conducts an independent investigation." (*Id.* at 3–4.)

---

[4] From Mr. Scotchlas's declaration, it is unclear whether he is describing an AIB's process in general terms or this specific AIB's process because the verb tense shifts throughout. (*See* Dkt. 54-8 at 3–4.) Construing his declaration in the light most favorable to Plaintiff, the court assumes that Mr. Scotchlas is describing the typical AIB's process. However, Plaintiff offers no evidence to suggest that the general process was not followed in this case. (*See* Dkts. 50, 53, 58.)

Over two days, November 19 and 20, 2019, the AIB panel interviewed eleven witnesses, including Plaintiff, Dr. Buckley, Ms. Mizell, Ms. Jenkins, Ms. Johnson, Mr. Kolendo, Dr. Yalamanchili, Mr. Sabol, and three others.  (Dkt. 49-30 at 1–2.)  The AIB panel interviewed Plaintiff first, and Ms. Lyons opened by explaining that the AIB was "look[ing] into allegations of bullying, harassment, [and] nonprofessional . . . behaviors that ha[d] apparently been going on at . . . Lake Baldwin . . . for a number of years in several departments" and that the panel would take it "as a given[] that these things [we]re occurring."  (Dkt. 54-7 at 3.)  She stated that the AIB's goal was to determine the source of this behavior and "what[ was] being done about it."  (*Id.*)  While Plaintiff maintained that she did not believe that Lake Baldwin had more problems than any other VA facility, she repeatedly referred to the "chaos" caused by others.  (*Id.* at 6, 10, 17, 35.)  Essentially, she felt any issues were the result of Lake Baldwin's siloed structure, which meant that there was no on-site multidisciplinary supervisor.  (*Id.* at 39; *see* Dkt. 49-4 at 174.)  Plaintiff asserted that this structure resulted in certain disciplines, especially nursing, attempting to shirk responsibilities that were then forced upon physicians.  (Dkt. 54-7 at 12–15; *see id.* at 17 ("[I]t was a big deal with [Jenkins] . . . telling her nurses . . . it's the providers['] responsibility . . . to do the secure message[s]. . . . [L]iterally telling them not to help . . . .").)  This issue was exacerbated, in her mind, by the lack of support she and the rest of Lake Baldwin's leadership received.  (*See id.* at 22 ("It just felt like nobody supported you with that. . . .  And so we were just kind of left trying to deal with this situation[ t]hat was getting worse and worse . . . .  I thought of leaving several

times . . . .").)  She expressed that the breakdown between disciplines was "causing anger" and "bad feelings."  (*Id.* at 49.)  Ms. Lyons concluded by instructing Plaintiff to "keep up the good work" and not to "give up."  (*Id.* at 56.)

Ms. Jenkins testified that Lake Baldwin's issues "start[ed] at the top" with "Dr. Buckley and [Plaintiff]."  (Dkt. 49-29 at 9.)  She described them as "suspicious of everything that happens" and "paranoi[d]" and asserted that they "fe[lt] like . . . everybody in the VA [wa]s against them at Orlando."  (*Id.* at 9–11.)  Ms. Lyons asked whether Ms. Jenkins "attribute[d] a lot of the . . . culture problems to the Buckley/[Plaintiff] team," and Ms. Jenkins said that she did.  (*Id.* at 12.)  She also testified as to Plaintiff's relationship with Mr. Sabol, the former administrative officer with whom Dr. Buckley had had a contentious relationship, noting that it was "horrific" and "nasty" such that Mr. Sabol eventually decided to leave Lake Baldwin due to high "stress levels."  (*Id.* at 30.)  Ms. Mizell testified that there was "a lot of conflict between management at times," referring specifically to Plaintiff, who she felt "create[d] an unhappy work environment."  (Dkt. 49-27 at 4.)  She described communicating with Plaintiff as "quite challenging," and she stated both that she felt "attacked" during meetings because Plaintiff would yell at her and that the meetings had only gotten better since Plaintiff "ha[d] not been attending" them as of late.  (*Id.* at 4, 25.)  Mr. Kolendo also testified that "[Plaintiff] [wa]s kind of a difficult person to work with," and that she "bull[ied] . . . people."  (Dkt. 49-28 at 35.)  Ms. Johnson testified that Plaintiff was "very protective" of the physicians and that she was quick to retaliate against anyone who complained about them.  (Dkt. 49-6 at 28.)  She also

described a "town hall" she had attended where Plaintiff "was disrespectful" to Mr.
Price and Dr. Yalamanchili.  (*Id.* at 26–27.)  When asked what might improve Lake
Baldwin's situation, Ms. Johnson specifically referenced Plaintiff as an issue, noting
that she and the other providers were "very good to their own" but "need[ed] to think
about the larger team."  (*See id.* at 27–29.)

Two days after concluding these interviews, the AIB panel made a verbal
recommendation to Dr. Zacher that Plaintiff be "immediate[ly] remov[ed] from her
supervisory position at Lake Baldwin . . . pending the completion of the final written
report."  (Dkt. 49-7 at 2.)  Dr. Zacher accepted the panel's recommendation and
temporarily demoted, or detailed, Plaintiff to a non-supervisory role at a different VA
facility.  (Dkt. 49-2; *see* Dkt. 49 at 12; Dkt. 50 at 20.)

Following Plaintiff's detail, a number of Lake Baldwin's physicians sent Dr.
Zacher, among others, letters outlining their support for Plaintiff.  (*See* Dkts. 50-24, 50-
25, 50-26.)  In a letter to other VA leadership explaining her decision in light of these
letters, Dr. Zacher reiterated the findings of the AIB panelists and explained that they
had recommended Plaintiff's removal.  (Dkt. 50-27 at 2.)  She suggested that the AIB's
findings notwithstanding, Lake Baldwin's physicians saw Plaintiff as "being their
champion[]" and likely felt her detail was "retaliatory for sticking up for" them.  (*Id.*)
She noted that while Lake Baldwin's "All Employee Survey" scores were "fairly
high," the AIB "saw [the scores] as [reflective of] the management protecting their
individual lanes and not working effectively together."  (*Id.*; *see* Dkt. 53-17 (the 2019
All Employee Survey scores).)

On January 13, 2020, the AIB issued its final report. (Dkt. 49-30.) It stated that due to the numerous reports, email threads, and complaints "indicat[ing] a 'toxic work environment,'" the AIB had taken it "as fact" that such an environment existed. (*Id.* at 2.) Mr. Scotchlas declares that he was "concern[ed]" by "the number and variety of documented, reported issues surrounding Lake Baldwin," because the issues did not represent "normal friction between coworkers at a healthcare facility," and that Ms. Lyons and Dr. Murphy both "shared [his] concerns." (Dkt. 54-8 at 2.) He specifically referenced an email Dr. Mahmood sent Plaintiff, referring to a nurse as "vile," "vindictive," and "devious," and states that the panelists had seen no evidence that Plaintiff, or anyone else in leadership, "took any concrete steps to resolve th[e] . . . incident." (*Id.*) The AIB panel reported that Plaintiff "caused a workplace culture that was disrespectful and not psychologically safe." (Dkt. 49-30 at 2.) According to the AIB panel, Dr. Buckley and Dr. Yalamanchili were also at fault. (*Id.* at 3.) The panel recommended that both Plaintiff and Dr. Buckley be removed from their supervisory roles. (*Id.* at 5.)

That same day, Jimmy Mannon, an HR officer, emailed Dr. Zacher to inform her that Plaintiff and Dr. Buckley had not responded to attempts to contact them and had therefore not been sent transcripts of their testimony in order for them to provide corrections. (Dkt. 50-28 at 2.) Michael Kraus, a human resources specialist who served as the AIB panel's technical representative, (Dkt. 49-1 at 2), testified that it was the court reporter's duty to get the transcripts to the witnesses for submission of corrections, (Dkt. 54-9 at 39). A subsequent email from Damon Newton, a risk

manager with the Orlando VA, stated that "[m]ultiple attempts were made to contact [Plaintiff and Dr. Buckley] unsuccessfully" until January 13, 2020, when Mr. Newton finally made contact with Plaintiff and sent her a copy of the transcript. (Dkt. 50-31 at 2.) On January 23, 2020, Plaintiff responded with ten pages of corrections, which included a statement regarding her concern that she was not fully apprised of the scope of the AIB. (Dkt. 50-29.) Plaintiff also—about two months after having been interviewed by the AIB—inserted discrete statements she claims were made by herself and the panelists that she believed were missing from the transcript. (*Id.* at 3.) For example, she claimed that Ms. Lyons had specifically stated that Plaintiff was "not the subject of the investigation." (*Id.*) Mr. Kraus testified that he ultimately received Plaintiff's corrections and forwarded them to the AIB. (Dkt. 54-9 at 41.)

Dr. Zacher declares that on March 10, 2020, based on the AIB's recommendations and "[her] own independent review" of "all the evidence," including Plaintiff's corrections, she recommended that Plaintiff be demoted because "Lake Baldwin and its employees would benefit from new leadership." (Dkt. 49-7 at 3; Dkt. 54-6 at 4.) This recommendation was presented to Plaintiff in a written letter, which stated that "[t]he final decision to" demote Plaintiff "ha[d] not been made" and would be made by the medical center director, Timothy Cooke. (Dkt. 49-31 at 3; Dkt. 49-32 at 1.) The letter outlined the specific reasons the recommendation was being made and gave Plaintiff an opportunity to respond. (*See* Dkt. 49-31.) Plaintiff did respond, asserting that the reasons given for her demotion were all based on unsupported, self-serving hearsay and speculation, and that she could not "control the

- 15 -

perceptions of others." (Dkt. 50-33 at 2.) Plaintiff later responded in more detail, stating that the AIB panel was discriminatory and that the "[i]nterviewers['] top priority [was] to paint [her] as the 'loud, angry, aggressive [b]lack [w]oman.'" (Dkt. 50-34 at 13.) She claimed that the "AIB was racist." (*Id.* at 14.) She suggested that the panelists had "run[] away with false innuendos that [we]re all unproven" and that the "entire AIB need[ed] to be thrown out" as "corruption at its highest level." (*Id.* at 13.) She also challenged the credibility of some of the interviewees upon whose testimony the AIB had based its recommendations, asserting that Mr. Kolendo, Ms. Mizell, Ms. Johnson, and Ms. Jenkins were not credible witnesses. (*Id.* at 14–15.) She noted, for example, that Mr. Kolendo had been involuntarily committed "due to instability." (*Id.* at 14.)

On January 15, 2020, the AIB panel's final report was emailed to some of the Orlando VA's leadership, including Dr. Zacher and Mr. Cooke. (Dkt. 54-11 at 1; Dkt. 49-32 at 1.) Mr. Cooke responded to that email, stating: "These are pretty compelling findings." (Dkt. 54-11 at 1.) He declares that Dr. Zacher forwarded her recommendation to him, but that he nevertheless "independently reviewed the entire evidence file from the AIB panel and [Dr.] Zacher's recommendation," as well as Plaintiff's reply. (Dkt. 49-32 at 2.) Mr. Cooke met with Plaintiff to discuss her proposed demotion, though Plaintiff testifies that he was "very rude" and "very dismissive" and that he stated: "I believe whatever's in this file." (Dkt. 49-4 at 173–

74.)[5]  Plaintiff declares that Mr. Cooke "repeated several times that all he needed to consider was the materials that he had received from the AIB."  (Dkt. 53-2 at 23.)

On March 25, 2020, Mr. Cooke issued a formal letter of demotion to Plaintiff.  (Dkt. 49-3.)  In that letter, he stated that, after considering "all the evidence," including Plaintiff's "oral and written replies," he had determined that she had engaged in "conduct unbecoming a federal supervisor."  (*Id.* at 1.)  He cited the behavior in which, according to the AIB, Plaintiff had engaged, noting that "[m]anagement ha[d] lost confidence in [Plaintiff's] ability to provide the leadership necessary for [her] position."  (*Id.*)  In addition to being stripped of her supervisory status, Plaintiff states that she received a $2,000 pay cut and "lost considerable [m]arket [p]ay, [p]erformance [p]ay[,] and bonuses."  (Dkt. 50-2 at 12–13.)  Dr. Buckley was also removed from her leadership role.  (Dkt. 49-7 at 4.)

Plaintiff initiated this action with pro se claims of race discrimination (Count I) and retaliation (Count II).  (Dkt. 1.)  She alleges that she has exhausted all of her administrative remedies, and Defendant provides no argument to the contrary.  (*Id.* at 2; *see* Dkts. 49, 54, 57.)  She seeks compensatory damages and legal fees and asks that the court determine that Defendant violated Title VII.  (Dkt. 1 at 20.)  Soon after Defendant answered the complaint, counsel appeared in this case on Plaintiff's behalf.

---

[5] While Plaintiff testified at her deposition that she was officially demoted by Dr. Zacher and that Cooke was only there as an avenue to appeal that decision, (Dkt. 50-3 at 56), she appears to drop this assertion in her motion, (*see* Dkt. 50 at 14).  In any event, the record demonstrates that the final decision to demote Plaintiff was Mr. Cooke's, though Plaintiff maintains that he merely rubber stamped Dr. Zacher's recommendation.  (*See* Dkt. 49-3; Dkt. 49-31 at 3; Dkt. 50 at 14.)

(*See* Dkts. 5, 8, 9.)  Discovery closed on October 25, 2024.  (*See* Dkt. 43.)  The parties

thereafter filed cross-motions for summary judgment, and each opposes the other's

motion.  (*See* Dkts. 49, 50, 53, 54, 57, 58.)

## APPLICABLE STANDARDS

Summary judgment is appropriate if no genuine dispute of material fact exists

and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

The party moving for summary judgment must "cit[e] to particular parts of materials

in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other

materials" to support its position that it is entitled to summary judgment.  Fed. R. Civ.

P. 56(c)(1)(A).  "The court need consider only the cited materials" when resolving the

motion.  Fed. R. Civ. P. 56(c)(3); *see HRCC, Ltd. v. Hard Rock Cafe Int'l (USA), Inc.*, 703

F. App'x 814, 817 (11th Cir. 2017) ("This rule was implemented so that a court may

decide a motion for summary judgment without undertaking an independent search

of the record." (quotation omitted)).

A factual dispute is "genuine" only if "a reasonable jury could return a verdict

for the non[-]moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A fact is "material" if the fact could affect the outcome of the lawsuit under the

governing law.  *Id.*  The moving party bears the initial burden of identifying those

portions of the record showing a lack of a genuine factual dispute.  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260

(11th Cir. 2004).  If the movant shows that no evidence supports the non-moving

party's case, the burden then shifts to the non-moving party to show that there are, in fact, genuine factual disputes precluding judgment as a matter of law. *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see Burger King Corp. v. Weaver*, 169 F.3d 1310, 1321 (11th Cir. 1999) ("The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." (quotation omitted)). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine dispute of material fact. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *see also HRCC*, 703 F. App'x at 816–17 ("Presenting arguments in opposition to a motion for summary judgment is the responsibility of the non-moving party, not the court." (alteration adopted) (quoting *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990))). In determining whether a genuine dispute of material fact exists, the court must view the evidence and draw all factual inferences in the light most favorable to the non-moving party and must resolve any reasonable doubts in that party's favor. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Summary judgment should be granted only "[w]here the record taken as a whole could

not lead a rational trier of fact to find for the non[-]moving party." *Matsushita*, 475
U.S. at 587.

## ANALYSIS

The court begins by outlining the framework for evaluating employment
discrimination and retaliation claims brought by federal employees. The court then
considers the adverse employment actions raised by Plaintiff before turning to her race
discrimination and retaliation claims.

### A. Federal-Sector Employment Discrimination and Retaliation Claims

Because Plaintiff was a federal employee, Title VII's federal-sector provision
applies to her discrimination claim. *See Babb v. Sec'y, Dep't of Veterans Affairs* ("*Babb
II*"), 992 F.3d 1193, 1198 (11th Cir. 2021) ("Because [the plaintiff] is employed by the
VA, we look to Title VII's federal-sector provision."). Under that provision, "[a]ll
personnel actions affecting employees or applicants for employment . . . in executive
agencies . . . shall be made free from any discrimination based on race." 42 U.S.C.
§ 2000e-16(a). "[F]ree from any discrimination" means that "personnel actions must
be made in a way that is not tainted by differential treatment based on a protected
characteristic." *Terrell v. Sec'y, Dept. of Veterans Affs.*, 98 F.4th 1343, 1351–52 (11th Cir.
2024) (cleaned up). Under this standard, a federal employer violates Title VII if it
permits unlawful discrimination "to contribute to any personnel action, even if that
discrimination was not the but-for cause of the ultimate decision." *Id.* at 1352
(quotation omitted). That is, "race discrimination cannot play any role in the way a
federal-sector employer makes a decision," and liability under Title VII's federal-sector

provision will attach if a federal employer "allows race discrimination to contribute to any personnel action—even if the federal employer would have made precisely the same decision had it not engaged in race discrimination." *Buckley v. Sec'y of Army*, 97 F.4th 784, 793 (11th Cir. 2024) (citation omitted).  This is a lighter burden than that borne by private-sector plaintiffs under the *McDonnell Douglas*[6] framework.  *See id.* at 794–95 ("[T]he burden under *McDonnell Douglas* is heavier than Title VII imposes on a plaintiff in a federal-sector case.").

This analysis also applies to Defendant's retaliation claim.  Title VII's "prohibition of any discrimination . . . directly bars reprisals against federal employees who file charges of discrimination" such that "all personnel actions must be made free from any retaliation." *Id.* at 798 (alteration adopted) (quotations omitted).  Thus, to survive summary judgment, Plaintiff need only have "submitted evidence that would allow a reasonable jury to find that retaliation 'play[ed] *any* part' in [Defendant]'s decision-making process." *Id.* (quoting *Babb v. Wilkie* ("*Babb I*"), 589 U.S. 399, 406 (2020)).

Even still, a federal-sector plaintiff bears the "burden of proving either 'discriminatory considerations' or their 'taint.'"  *Terrell*, 98 F.4th at 1354; *see Lewis v. Sec'y of U.S. Air Force*, No. 20-12463, 2022 WL 2377164, at *10 (11th Cir. June 30, 2022) ("[A] federal[-]sector employee alleging [a] Title VII . . . claim[] must still establish a *prima facie* case that a decision was not 'made free from any

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

discrimination' . . . .").  She may do so, for example, by "provid[ing] evidence of a
comparator employee—one similarly situated in all material respects—who was
treated differently."  *Id.* at *11.  Or, more broadly, she can point to "circumstantial
evidence that creates a triable issue concerning the employer's discriminatory intent."
*Id.* at *9 (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019)).
Such evidence "includ[es] discriminatory comments, suspicious timing, arbitrariness
in the employer's actions, pretext in the employer's rationale, better treatment of
similarly situated . . . employees outside the protected group, and similar experiences
by . . . employees [within the protected group]."  *Bell v. Sec'y, Dep't of Veterans Affs.*, No.
22-12698, 2024 WL 1462405, at *4 (11th Cir. Apr. 4, 2024).  In sum, a federal-sector
plaintiff must still point to circumstantial evidence demonstrating discrimination or
retaliation, but she bears a lighter burden on this point than a non-federal-sector
plaintiff under *McDonnell Douglas*.  *See Rosado v. Sec'y, Dep't of the Navy*, 127 F.4th 858,
866 (11th Cir. 2025) ("[I]f a federal employee wishes to use the *McDonnell Douglas*
framework to state a claim, he may continue to do so.  It's just that *McDonnell Douglas*
imposes a heavier burden than a federal employee must satisfy.").

Moreover, this lighter standard does not alter a federal-sector plaintiff's
requirement to demonstrate an adverse employment action.  *See Buckley*, 97 F.4th at
794 ("[A] federal-sector employee must show . . . that a protected characteristic played
any part in her employer's process in reaching an adverse employment decision."
(emphasis omitted)).  A plaintiff raising a Title VII discrimination claim "must show
some harm respecting an identifiable term or condition of employment."  *Muldrow v.*

*City of St. Louis*, 601 U.S. 346, 354–55 (2024). That is, she must point to an action that "brought about some disadvantageous change in an employment term or condition." *Id.* at 354 (quotation omitted). She need not "show . . . that the harm incurred was significant" or "that the disadvantage . . . exceed[ed] a heightened bar." *Id.* at 355 (quotation omitted). Title VII's anti-retaliation provision, on the other hand, "applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm." *Id.* at 357. To support a retaliation claim, the allegedly retaliatory conduct must have been "serious enough to dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* (cleaned up).

Finally, while but-for cause is not required to establish liability, "the but-for causation of a given personnel action remains important in determining the appropriate remedy." *Babb II*, 992 F.3d at 1205 n.8 (quotation omitted). This is because "[r]elief must redress the injury the [unlawful] discrimination [or retaliation] inflicted," which flows from the principle that "the law seeks to make a plaintiff whole," not to "place the plaintiff in a better position than she would have been in had the employer not discriminated against her." *Buckley*, 97 F.4th at 794; *see Babb I*, 589 U.S. at 413 ("It is bedrock law that requested relief must redress the alleged injury. . . . To obtain [reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision], [a plaintiff] must show that [unlawful] discrimination was a but-for cause of the employment outcome." (quotation omitted)). Accordingly, where a federal-sector plaintiff shows that discrimination or retaliation was a but-for cause of the adverse action she complains

of, the court may award her "retrospective relief, like compensatory damages and back pay." *Terrell*, 98 F.4th at 1352.  If she can only show that the action was "tainted" by discrimination or retaliation, however, "she is not entitled to damages," though the court may "consider[] injunctive or other forward-looking relief." *Id.*

With the relevant frameworks established, the court turns to Plaintiff's claims.

## B. Adverse Employment Action

The parties agree (at least for purposes of summary judgment) that Defendant's decisions to detail and demote Plaintiff were adverse employment actions.  (*See* Dkt. 49 at 17; Dkt. 50 at 18–19.)  These actions satisfy the adverse employment action requirement for both of Plaintiff's claims because they caused "some harm" to "an identifiable term or condition" of Plaintiff's employment, *Muldrow*, 601 U.S. at 355, and would have "dissuade[d] a reasonable worker from making or supporting a charge of discrimination," *id.* at 357 (quotation omitted).

In her complaint, Plaintiff asserts numerous other actions she claims constitute adverse employment actions.  (*See* Dkt. 1 at 16, 18.)  While Plaintiff may not "rely on h[er] pleadings to avoid judgment against h[er]" at the summary judgment stage, *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (quotation omitted), these arguments appear at various points in her briefing, (*see, e.g.*, Dkt. 53 at 12–13), and the court will briefly consider them.

As to her discrimination claim, these purportedly adverse actions include "intimidating" Plaintiff while she was investigating Ms. Artis's harassment claim and

"subjecting her to an AIB . . . focusing on racial and misogynistic matters." (Dkt. 1 at 16.)[7]  Presumably, the complained-of intimidation refers to Plaintiff's encounter with Mr. Leafgreen.  (*See* Dkt. 53 at 13 (referring to Mr. Leafgreen's intimidation of Plaintiff).)   These actions do not constitute adverse employment actions because neither an internal investigation nor an uncomfortable conversation with a coworker, without more, affect the terms or conditions of one's employment.  *Muldrow*, 601 U.S. at 355; *see Henderson v. City of Birmingham*, 826 F. App'x 736, 741 (11th Cir. 2020) (affirming the dismissal of the plaintiff's disparate-treatment claim because the plaintiff failed to show "how, if at all, [internal discipline and an investigation] affected the terms, conditions, or privileges of his employment"); *see also Troupe v. DeJoy*, 861 F. App'x 291, 295 (11th Cir. 2021) ("Title VII is not a 'general civility code' and does not make ordinary workplace conflicts actionable." (quotation omitted)).  In particular, Mr. Leafgreen's comment has little bearing on Plaintiff's claims, as she provides no indication that Mr. Leafgreen was involved in the decisions to detail and demote her. *See Buckley*, 97 F.4th at 794 ("[A] federal-sector employee must show . . . that a protected characteristic played any part in her employer's process in reaching an adverse employment decision." (emphasis omitted)).

As to her retaliation claim, Plaintiff asserts that the decisions to subject her to an AIB, conduct a "sham re[]investigation" of Ms. Artis's complaint, and "gut[]

---

[7] While Plaintiff references misogyny in her complaint, her only discrimination claim is based on race. (*See* Dkt. 1 at 16–20.)  Also, while Plaintiff asserted that Defendant's failure to investigate her complaint against Mr. Kolendo was an adverse employment action in her complaint, (*see* Dkt. 1 at 16), she has expressly dropped this argument, (*see* Dkt. 53 at 12 n.55).

[Plaintiff's] job responsibilities as the Clinical Director for Lake Baldwin" were adverse
employment actions. (Dkt. 1 at 18.) The AIB, on its own, does not count as an adverse
employment action. *See Rademakers v. Scott*, 350 F. App'x 408, 412–13 (11th Cir. 2009)
(affirming summary judgment as to a retaliation claim after determining that an
"investigation[ and] a coercive polygraph examination" would not "dissuade a
reasonable worker from making or supporting a charge of discrimination" (quotation
omitted)). Additionally, Plaintiff offers no argument as to how the decision to
reinvestigate Ms. Artis's complaint would dissuade a reasonable employee in
Plaintiff's position from raising or supporting a charge of discrimination. (*See* Dkts.
50, 53, 58.) *See Muldrow*, 601 U.S. at 357. The reinvestigation does not satisfy the
adverse action standard because Plaintiff has not pointed to any harm caused to her
by this action. *Compare Jones v. Aaron's Inc.*, 748 F. App'x 907, 917 (11th Cir. 2018)
(cutting the plaintiff's hours after she took FMLA leave was materially adverse), *with
Eginton v. Fla. State Univ.*, 111 F. Supp. 3d 1263, 1275 (M.D. Fla. 2015) (reassigning a
quarter of the plaintiff's curriculum to a male instructor was not materially adverse);
*see also Byrd v. Auburn Univ. Montgomery*, 268 F. App'x 854, 856 (11th Cir. 2008)
("[O]rdinary tribulations of the workplace and petty slights . . . are not actionable.").

While Plaintiff's allegation that her job responsibilities were "gutt[ed]" likely
does satisfy the standard, *cf. Lima v. Fla. Dep't of Child. & Fams.*, No. 8:13-cv-1809-T-
35TBM, 2014 WL 11352891, at *7 (M.D. Fla. Nov. 13, 2014) (indicating that a "more
than minimal" change in job responsibilities would be materially adverse to a
reasonable employee), it would appear that this charge is duplicative of Plaintiff's

detail and demotion. (*See* Dkt. 50 at 12 n.20 (stating that "[i]n her new position, [Plaintiff] lost considerable status and prestige[ and] had no supervisory responsibilities").) In any event, Plaintiff does not argue that she suffered from a separate decision that removed significant responsibility from her. (*See id. passim*; Dkts. 53, 58.)

To the extent that Plaintiff asserts adverse employment actions separate from her detail and demotion, she seemingly does so because these separate actions led to her detail and demotion. (*See* Dkt. 53 at 12–13 (arguing that the AIB "led ineluctably to [Plaintiff's] detail and demotion" and that Mr. Leafgreen's "intimidation . . . was a direct threat" that was "implemented six weeks later when . . . [Dr.] Zacher initiated the AIB process").) Accordingly, Plaintiff's adverse employment actions are limited to her detail and demotion for both her discrimination and retaliation claims. *See Muldrow*, 601 U.S. at 355, 357.

## C. Race Discrimination

To establish a prima facie case of race discrimination, Plaintiff was required to show that her race played a part in the decisions to detail and demote her. *See Buckley*, 97 F.4th at 794. Plaintiff's central theory of race discrimination is that Dr. Zacher, possessed of racial bias against her, maneuvered to have Plaintiff investigated by the AIB and ultimately demoted. (*See* Dkt. 50 at 16–18; *id.* at 24 ("The AIB itself was a sham, fatally defective[] 'show trial' used to shield [Dr.] Zacher's animus-driven scheme." (footnote omitted)).) Insofar as she complains of being detailed, this theory

of causation makes sense because Dr. Zacher made that decision. (*See* Dkt. 49-7 at 2.) Mr. Cooke, however, made the decision to demote Plaintiff. (*See* Dkt. 49-32 at 3–4.) Plaintiff does not allege that Mr. Cooke was motivated by racial animus—instead, she suggests that he "rubber[ ]stamped" Dr. Zacher's recommendation. (*See* Dkt. 50 at 14.) Plaintiff thus appears to forward a cat's paw theory of discrimination, which permits a plaintiff to impute a non-decisionmaker's racial animus to the decisionmaker. *See Butler v. Emory Univ.*, 45 F. Supp. 3d 1374, 1389 (N.D. Ga. 2014) ("A plaintiff may use the cat's paw theory to impute a non-decisionmaking employee's discriminatory animus to an otherwise-neutral decision[]maker." (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999))).

The court begins with the claim that Dr. Zacher racially discriminated against Plaintiff. The court then considers Plaintiff's cat's paw theory before considering the balance of Plaintiff's proffered evidence of discrimination.

### 1. Dr. Zacher

Plaintiff's primary evidence of Dr. Zacher's racial animus is Plaintiff's declaration that "Dr. Zacher has a history of initiating AIBs against African American physicians and staff that have opposed unlawful employment practices or that have participated in EEO activities." (Dkt. 50-2 at 13; *accord* Dkt. 53-2 at 30.) Although it is not clear what it means to "initiat[e] AIBs against" an individual, construing this statement in the light most favorable to Plaintiff, the court infers that Plaintiff's declaration means that Dr. Zacher has a history of instituting AIBs in order to target African Americans who engaged in protected activities. However, Plaintiff's

statement is not that Dr. Zacher targeted these individuals because of their race.  Nor does Plaintiff's statement indicate that these other African Americans were also detailed or demoted, or otherwise experienced adverse employment actions as a result of these purported AIBs.  Moreover, as noted above, being subject to an internal investigation is not, on its own, an adverse employment action.  *See Henderson*, 826 F. App'x at 741; *Rademakers*, 350 F. App'x at 412–13.

While "evidence of behavior toward . . . other employees in the same protected group is one type of circumstantial evidence that can support an inference of discrimination," that evidence should be "closely related to the plaintiff's circumstances."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1344 (11th Cir. 2011) (cleaned up).  The *Smith* court determined that the record supported an inference of race discrimination because the plaintiff could name employees within his protected class who engaged in similar conduct and were also fired, as well as employees outside his protected class who engaged in similar conduct but who were not fired.  (*Id.* at 1341–43.)  Plaintiff does not name any other African Americans who engaged in protected activity that were actually subject to AIBs,[8] provide any factual background that would permit the court to determine whether her case is closely related to these others', or point to individuals outside of her protected class who engaged in similar conduct without being subject to an AIB.  (*See* Dkt. 50-2 at 13; Dkt. 53-2 at 30.)  *See*

---

[8] While her motion mentions an AIB initiated against Ms. Artis, (Dkt. 50 at 24), the record citation for this assertion does not reference any AIB initiated against Ms. Artis, or support the claim that Dr. Zacher initiated an AIB against Ms. Artis because of her race.

*Bell*, 2024 WL 1462405, at *6 (disregarding evidence that the plaintiff's coworkers were discriminated against because the plaintiff's "evidence [wa]s not similar enough to support an inference that [the plaintiff] was subjected to differential treatment based on race"). Even assuming that Dr. Zacher did subject other African Americans to AIBs, the court cannot infer racial animus absent evidence of a racially discriminatory intent.

Plaintiff also repeatedly asserts that Dr. Zacher's bias can be inferred from the fact that she "controlled the documentary evidence provided to the AIB and excluded any evidence that would exonerate [Plaintiff]." (Dkt. 50 at 16; *see, e.g.*, *id.* at 16 n.30, 23, 24 & n.39, 25 n.40; Dkt. 53 at 14 & n.61–62.) As evidence, she cites the testimony of Mr. Kraus, but he testified that he did not have first-hand knowledge as to Dr. Zacher's involvement with the AIB and that his testimony was based on assumptions. (Dkt. 54-9 at 118–19; *see id.* at 80 ("I don't recall any conversations between Dr. Zacher and myself regarding the AIB.").) Assumptions, absent personal knowledge, cannot defeat summary judgment. *See O'Donnell v. Derrig*, 346 F. App'x 385, 389 (11th Cir. 2009) (disregarding an assumption made by one of the plaintiff's witnesses as "insufficient to establish a genuine issue of material fact"). Moreover, even if Mr. Kraus had personal knowledge, he did not testify that Dr. Zacher excluded exculpatory evidence. (Dkt. 54-9 at 115–16.) Rather, he testified that Dr. Zacher merely "provided information to the panel." (*Id.* at 115.) He also testified, however, that the AIB had wide latitude to conduct the investigation as it saw fit and that "Dr. Zacher stayed out of the entire process when it was chartered until she received the

out-brief." (*Id.* at 116.)  Further still, Mr. Scotchlas—one of the AIB panelists—stated that the "totality of the requested documents and witnesses is at the discretion of the board" and that he "ha[d] no reason to believe that anyone outside the board members influenced which documents were received or which witnesses were interviewed." (Dkt. 54-8 at 3–4.)  In sum, Plaintiff has put forward no evidence that Dr. Zacher withheld exculpatory evidence from the AIB, and the court cannot infer racial animus from Plaintiff's unsupported assertion to the contrary.  *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("[U]nsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

On a related note, Plaintiff cites as evidence of discriminatory intent Dr. Zacher's "failure to send the supportive letters from [Lake Baldwin] physicians to the AIB." (Dkt. 50 at 17–18.)  These letters, however, were not penned until after the AIB had concluded its investigation and verbally recommended that Plaintiff be demoted. (*See* Dkts. 50-24, 50-25, 50-26.)  Plaintiff does not argue that Dr. Zacher was obligated to provide the letters to the AIB.  (*See* Dkts. 50, 53, 58.)  Moreover, a review of these letters indicates that the physicians sought to appeal directly to Dr. Zacher and other VA leadership, not the AIB.  (*See* Dkts. 50-24, 50-25, 50-26.)  Indeed, the collective letter signed by a group of physicians specifically "request[ed] a meeting with leadership . . . to discuss the situation." (Dkt. 50-24 at 3.)  There is no record evidence from which to infer that Dr. Zacher's failure to send these letters to the AIB was racially discriminatory.

Nor does Dr. Zacher's purported failure to "investigate [Mr.] Kolendo's . . . frightening assault" on Plaintiff demonstrate race discrimination. (Dkt. 50 at 17.) Dr. Zacher testified that it was not her role as the acting medical center director to investigate interpersonal conflicts between her subordinates and that she "let the involved [investigators] address it." (Dkt. 54-4 at 120.) This testimony is corroborated by Mr. Leafgreen's testimony that the role of investigating these complaints generally fell to the "first line supervisor . . . or service chief." (Dkt. 54-3 at 40.) Dr. Buckley was Mr. Kolendo's supervisor, (Dkt. 49-4 at 118), while Dr. Zacher, at this time, was the interim medical center director, (*see* Dkt. 54-4 at 10–11).

Plaintiff also points to Dr. Zacher's "reliance on the AIB's faulty findings" in reaching her decision to demote Plaintiff. (Dkt. 50 at 23.) Plaintiff's citations to the AIB's report, Dr. Zacher's recommendation to demote Plaintiff, and Mr. Cooke's demotion letter do not support this argument, and the court cannot craft an argument for her. (*See* Dkt. 50 at 23.) *See Dunmar*, 43 F.3d at 599 ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."). Moreover, to support her argument that Dr. Zacher's racial bias can be inferred from her reliance on the AIB's findings, Plaintiff needed to adduce evidence that Dr. Zacher knew or believed the AIB's findings to be faulty and relied on them anyway given Plaintiff's race, as the question before this court is not whether Dr. Zacher's decision to demote Plaintiff was proper but whether it was racially discriminatory. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (holding that an employer "may fire an employee for a good

reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long
as its action is not for an unlawful reason." (alteration adopted) (quotation omitted));
*Durr v. Sec'y, Dep't of Veterans Affairs*, No. 21-12867, 2022 WL 2315086, at *2 (11th Cir.
June 28, 2022) (citing *Jefferson*, 891 F.3d at 924).

Finally, Plaintiff cites Dr. Zacher's October 2, 2019 email as evidence of racial
bias. (Dkt. 50 at 17.) The email is part of a chain discussing Plaintiff and Dr.
Mahmood's celebration after a nurse's move to another team. (*See* Dkt. 50-15.)
Viewing the email in the light most favorable to Plaintiff, a reasonable jury could find
that, upon receiving this email, Dr. Zacher immediately determined that Plaintiff
would be held responsible despite the conflicting stories as to what occurred. (*See id.*
at 2.) However, Dr. Zacher stated in the email that Plaintiff was to be "held most
accountable" given her status "as a supervisor," and there is no indication that
Plaintiff's race played a role in this incident. (*See id.*)

Even if all of Plaintiff's statements about Dr. Zacher are true, none of them
supports the conclusion that Dr. Zacher acted out of race discrimination as opposed
to some other basis. In short, Plaintiff has not produced evidence from which a
reasonable jury could infer that Dr. Zacher's decision to detail Plaintiff was tainted by
race discrimination.

### 2. Cat's Paw Theory

To succeed under a cat's paw theory, Plaintiff needed to show that Mr. Cooke
decided to demote Plaintiff solely on the basis of Dr. Zacher's biased recommendation.
*See Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023)

("A cat's[ ]paw argument requires evidence that the ultimate (and manipulated) decisionmaker . . . followed the biased recommendation of another . . . without independently investigating the complaint against the employee." (quotation omitted)).  At the outset, any cat's paw theory is misplaced here because there is no evidence that Dr. Zacher was biased against Plaintiff's race, and thus there is no racial bias to impute to Mr. Cooke.  *See Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999) ("In [a cat's paw] case, the recommender is using the decisionmaker as a mere conduit . . . to give effect to the recommender's discriminatory animus.").  Even if she could show that Dr. Zacher was biased against her, Plaintiff's argument is unavailing.

In his decision letter, Mr. Cooke informed Plaintiff: "In reaching th[e] decision [to demote you], [your] oral and written replies were carefully considered along with all the evidence developed."  (Dkt. 49-3 at 1.)  Similarly, he stated in his declaration that he carefully reviewed all of the evidence considered by the AIB, "along with [Plaintiff]'s response," and determined that Plaintiff's demotion was proper, independent of influence from Dr. Zacher.  (Dkt. 49-32 at 2–4.)  Indeed, he stated that he reviewed the AIB panel's final report prior to receiving Dr. Zacher's recommendation and that his "unprompted, initial impression of the AIB report" was that its findings were "pretty compelling."  (Dkt. 49-32 at 3; *see* Dkt. 54-11 at 1.)  At this time, he stated that he "barely knew" Dr. Zacher.  (Dkt. 49-32 at 3.)

As evidence that Mr. Cooke rubber stamped the recommendation, Plaintiff cites to their March 23, 2020 meeting during which she claims he indicated that "all he

needed to consider was the materials that he had received from the AIB." (Dkt. 50-2 at 12.) She argues that it was clear to her that he "had not bothered to read [her] rebuttal and supporting materials." (*Id.*) Although it does not follow from Mr. Cooke's statements that he did not review Plaintiff's submissions, Plaintiff notes that he appeared to her to be "highly agitated about meeting with [her]," had only ten minutes to meet, and was "impatient and . . . not paying much attention to [her]" during the meeting. Once again, it does not follow from this evidence that Mr. Cooke did not conduct an independent investigation. (*Id.*)

Even if it were true that Mr. Cooke never reviewed Plaintiff's rebuttal materials, he nevertheless could have conducted an independent investigation. The question is not whether he undertook to personally analyze all of the available evidence before rendering a decision, but instead whether he was nothing more than "a rubber stamp of the biased recommendation." *Duncan v. Alabama*, 734 F. App'x 637, 639 (11th Cir. 2018). Accordingly, presuming that Mr. Cooke only reviewed the AIB's findings and disregarded Plaintiff's separate statements, such an investigation would not render him a mere rubber stamp regarding Dr. Zacher's recommendation. *See id.* ("When an employer makes an effort to independently investigate before making an adverse employment decision, it should not be held liable for another employee's hidden discriminatory motives."); *Harris*, 82 F.4th at 1301 (affirming grant of summary judgment where "[the plaintiff] concede[d] that the individual who fired her . . . conducted her own investigation and relied on, if anything, the recommendation of someone other than [the purportedly biased individual]").

Accordingly, Plaintiff's cat's paw theory fails.  *See Hitt v. CSX Transp.*, 116 F.4th 1309, 1318 (11th Cir. 2024) (affirming grant of summary judgment because "[t]here [wa]s no evidence of a manipulated decisionmaker").

To the extent that Plaintiff argues that Dr. Zacher's purported discriminatory motive may be imputed to the AIB panel such that Mr. Cooke's reliance on the panel's findings can be traced back to Dr. Zacher, (*see* Dkt. 58 at 7), that attempt is unavailing. Plaintiff has not presented any evidence to support her assertion that Dr. Zacher was racially biased against her, and as a result there is no racial animus to impute.  Even presuming there was, this argument fails.  Plaintiff asserts that Dr. Zacher "controlled the documentary evidence provided to the AIB and excluded any evidence that would exonerate" her.  (Dkt. 50 at 16.)  As noted above, this assertion is not supported by the record.  (*See* Dkt. 54-9 at 80–81, 118–19; Dkt. 49-33 at 3–5.)  Moreover, Mr. Scotchlas provided a statement indicating that the panel's decision was based exclusively on the evidence presented to the panel.  (*See* Dkt. 49-33 at 3 (explaining that the AIB panel concluded that Lake Baldwin "needed a fresh start under new leadership to resolve the ongoing problems" and that this conclusion "w[as] based only on the evidence and testimony presented to the AIB panel").)  He stated that the panel's decision was not the result of any pressure or influence from Dr. Zacher.  (*Id.* at 4–5.)  Finally, Plaintiff testified before the AIB—if the AIB was interested in receiving evidence about her, it could have asked her for it directly, and there is no record evidence that it did not do so because of Dr. Zacher.  (*See id.*)

Plaintiff also suggests that one of the AIB panelists—Ms. Lyons—was biased against her. (Dkt. 49-4 at 153.) As evidence, she notes that Ms. Lyons stated at the beginning of Plaintiff's AIB deposition that she had already determined that Lake Baldwin was a toxic workplace. (*Id.* 153–56.) It is unclear how this statement indicates Ms. Lyons's racial bias against Plaintiff. While it is true that the AIB accepted at the outset of its investigation that Lake Baldwin was a toxic work environment, it expressly based this belief on the documentary evidence before it, the bulk of which evidently indicated to the panel that Lake Baldwin had issues. (*See* Dkt. 49-30 at 2; *see also* Dkt. 54-8 at 2.) The court reiterates that the question before it is whether the record supports that race discrimination tainted the decisions to detail and demote Plaintiff, not whether the AIB panel was right to recommend her demotion. *See Jefferson*, 891 F.3d at 924.

Ultimately, Plaintiff relies on her "honest[] belie[f] that" Ms. Lyons was acting at the behest of Dr. Zacher, claiming that Ms. Lyons "must [have] be[en] somebody that Dr. Zacher kn[ew] because she[] [had] been at the VA for a while." (*Id.* at 154; *see id.* at 156 ("I believed a hundred percent that [Ms. Lyons] must be somebody [Dr.] Zacher knows who's doing her a favor.").) Though she conceded that this statement relied on speculation, she stated it was "speculati[on] with a very educated guess that [Ms. Lyon was] somehow connected to Dr. Zacher," a belief she felt was verified by the fact that the other panelists "barely said a peep," and that "it was all [Ms. Lyon's] show." (*Id.*) However, Plaintiff's belief is belied by the transcript of Plaintiff's AIB testimony, which indicates that Mr. Scotchlas and Dr. Murphy were also active

participants.  (*See* Dkt. 54-7 at 19–20, 25–36, 41, 45–46, 49–51.)  In any event, Plaintiff's subjective belief that Ms. Lyons was biased against her because she believes Ms. Lyons knew Dr. Zacher is insufficient to create a genuine dispute of material fact. *See United States v. Stein*, 769 F. App'x 828, 832 (11th Cir. 2019) (disregarding the plaintiff's statements made "to the best of [her] recollection" at the summary judgment stage because they "conveyed her subjective belief, not personal knowledge," and because "[b]elief, no matter how sincere, is not equivalent to knowledge" (quotation omitted)).

Plaintiff argues that the AIB "only interviewed [her] accusers[, Ms.] Jenkins, [Mr.] Kolendo, and [Ms.] Mizell," failed to interview others that would have supported Plaintiff, and "never confronted [Plaintiff] with the charges against her." (Dkt. 50 at 23, 24 n.39.)  These arguments are not persuasive.  First, the AIB interviewed eleven witnesses, many of whom Plaintiff does not allege were biased against her (including, for example, Dr. Buckley).  (Dkt. 49-30 at 2.)  Moreover, the AIB interviewed Plaintiff herself, and as such the assertion that the AIB only interviewed Plaintiff's accusers is false.  (*Id.*)  Second, the AIB had authority to interview individuals it deemed appropriate, (Dkt. 54-9 at 115), and its failure to interview the witnesses Plaintiff wishes it had is not evidence of racial bias against her. Third, at its inception, the AIB did not have any charges against Plaintiff to advise her of—pursuant to the memorandum outlining its scope, the AIB was charged with investigating "hostile work relationships across the staff," not Plaintiff herself.  (Dkt. 49-1 at 1.)

Plaintiff also highlights the AIB's failure to send her a transcript of her testimony so that she could review and correct it. (Dkt. 50 at 24.) However, Mr. Kraus provided uncontroverted testimony that it was the court reporter's responsibility, not the panelists', to furnish the AIB's witnesses with a transcript. (Dkt. 54-9 at 41.) Further, two separate emails included in the record indicate that Plaintiff and Dr. Buckley were not given their transcripts because they failed to respond to efforts to contact them, and Plaintiff has not cited record evidence to rebut this explanation. (Dkt. 50-28 at 2; Dkt. 50-31 at 2.) Plaintiff's argument that her transcript was suspiciously overlooked is therefore unavailing. (Dkt. 53 at 19 n.71.)

### 3. Comparators

While there is no requirement for Plaintiff to identify a comparator, presenting comparator evidence is one way in which she can establish a discriminatory motive behind her detail and demotion. *See Lewis*, 2022 WL 2377164, at *9. A proper comparator must be "'similarly situated in all material respects' to the plaintiff." *Id.* (quoting *Lewis*, 918 F.3d at 1226). "This determination relies on the individuals' 'substantive likenesses,' and a comparator may be sufficiently similar if []he has 'engaged in the same basic conduct (or misconduct) as the plaintiff,' was subject to the same employment policies as the plaintiff, had the same supervisor, and 'share[d] the plaintiff's employment or disciplinary history.'" *Id.* (quoting *Lewis*, 918 F.3d at 1227– 28).

In her complaint, Plaintiff submits several comparators in support of her race discrimination claim: Kevin Kolendo, Cory Price, Dr. John Hoy, Dr. Nicole

Robinson, Dr. Piya Vishnubhotla, Dr. Michelle Hamilton, and Stephen Sabol.  (Dkt.
1 at 17.)  In her more recent filings, however, she prunes this list to two: Dr. Hoy and
Mr. Kolendo.  (Dkt. 50 at 24; *see* Dkt. 53 at 13 n.59, 19 n.71; Dkt. 58 at 4–5.)  Mr.
Kolendo is not a proper comparator—he was not a doctor, had no supervising
authority, and was not found guilty of wrongdoing by an AIB.  *See Vinson v. Tedders*,
844 F. App'x 211, 214 (11th Cir. 2021) (determining that the plaintiff was not similarly
situated in all material respects to her comparators because they "had different work
experience, different job duties, and different job titles"); *Lewis*, 2022 WL 2377164, at
*11 (determining that a proffered comparator was insufficiently similar to the plaintiff
because "there [wa]s nothing in the record suggesting that [he] engaged in the same
basic misconduct or shared the same disciplinary history").

With regard to Dr. Hoy, Plaintiff notes that he "was subjected to an AIB[] and
remained in his position without being detailed following the AIB."  (Dkt. 50 at 18
n.32, 24.)  However, Plaintiff provides almost no details regarding Dr. Hoy's position
at the VA.  (*See id. passim*; Dkts. 53, 58.)  In her deposition testimony, she noted that
he was "chief of the radiology department," (Dkt. 49-4 at 120), though she provides
no analysis as to whether this position was substantially similar to her own as the
primary care section chief of Lake Baldwin, (*see* Dkt. 50).  *See Lewis*, 918 F.3d at 1228
("[A]s its label indicates—'all material respects'—a valid comparison will turn not on
formal labels, but rather on substantive likenesses. . . . [A] plaintiff and her
comparators must be sufficiently similar, in an objective sense, that they 'cannot
reasonably be distinguished.'" (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206,

231 (2015))). While she notes that Dr. Hoy was also subjected to an AIB, she testified that she did not see the results of the AIB but rather "heard that . . . there was a finding that he did do those things that they said." (Dkt. 49-4 at 120–21; *see id.* at 121 ("Q: Do you know what [the AIB's] ultimate recommendation was [as to Dr. Hoy]? A: I don't know their recommendation . . . .").) In fact, Defendant has produced the results of Dr. Hoy's AIB, which found that "[t]here [wa]s insufficient evidence that department leadership [(including Dr. Hoy)] [wa]s creating a toxic and retaliatory environment" and recommended that an additional, limited fact finding be undertaken "[i]f the allegations of a toxic environment and retaliatory behavior continue to be of concern." (Dkt. 49-37 at 12–13.) Accordingly, Dr. Hoy is also not a proper comparator. *See Lewis*, 2022 WL 2377164, at *11.

Although Plaintiff disputes the wisdom of the AIB's decision, the record does not support that the panel acted out of racial animus when it recommended her demotion. Plaintiff was required to show that her demotion was tainted by race discrimination—not merely that it was a decision that she did not like. *Compare Buckley*, 97 F.4th at 796 (concluding that the plaintiff had proffered sufficient evidence that race discrimination "tainted" the decision to fire her where the decisionmaker "stated [his] intent to 'get' [the plaintiff]," "asked [the plaintiff] an odd question that arguably invoke[d] a racial trope—about whether her children had the same father," and "fail[ed] to take . . . action to end [an] allegedly race-based patient-diversion scheme"), *with Terrell*, 98 F.4th at 1354 (affirming summary judgment against a federal-sector plaintiff because "the record d[id] not allow [the court] to conclude that

her [non-]selection was a discriminatory choice"), *and Turnage v. Wormuth*, No. (N.D. Ala. Apr. 1, 2022) (granting summary judgment to the defendant as to the plaintiff's race discrimination claim because the plaintiff offered "nothing more than subjective opinions" that were insufficient "without evidentiary support").  Because she has not adduced evidence to permit a reasonable jury to infer that race discrimination tainted the decisions to detail and demote her, Defendant's motion is granted as to Plaintiff's race discrimination claim.

### D. Retaliation

A prima facie case of retaliation requires a showing that (1) Plaintiff engaged in a protected activity, (2) Plaintiff suffered an adverse employment action, and (3) there is a causal connection between those two.  *See Terrell*, 98 F.4th at 1355.  Plaintiff argues that the decisions to detail and demote her were intended as retaliation for her reporting Mr. Leafgreen's KKK comment and substantiating Ms. Artis's allegations of discrimination in her fact finding report.  (Dkt. 50 at 18–19.)  Defendant does not argue that this conduct is not protected under Title VII but rather that Plaintiff has failed to demonstrate the requisite causality between these actions and her detail and demotion.  (*See* Dkt. 49 at 22–24; Dkt. 54.)  Accordingly, the court will presume for purposes of this order that these actions constitute protected activity.  *See Terrell*, 98 F.4th at 1355 ("The Equal Employment Opportunity Commission has defined 'opposition' to include passive resistance or informal conduct, as long as the circumstances show that the individual is conveying resistance to a perceived potential EEO violation." (quotation omitted)).

Defendant maintains that Plaintiff cannot satisfy causation because "[t]here is no evidence [that] the AIB panel, [Dr.] Zacher, or [Mr.] Cooke knew about [Plaintiff]'s recommendations or conclusion in the Artis fact[ ]finding." (Dkt. 49 at 23.) For retaliation to have tainted the decisions to detail and demote her, the decisionmakers must have known of Plaintiff's protected activity. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("[T]he plaintiff must generally show that the decision[]maker was aware of the protected conduct at the time of the adverse employment action. That requirement rests upon common sense. A decision[]maker cannot have been motivated to retaliate by something unknown to him." (internal citations omitted)). Knowledge "can be established by circumstantial evidence." *Id.*

Here, Dr. Zacher had knowledge of Plaintiff's complaint regarding Mr. Leafgreen's comment. Plaintiff sent her the email complaining about Mr. Leafgreen, (Dkt. 50-12), and Dr. Zacher stated in her declaration that she spoke to Mr. Price about the email after receiving it, (Dkt. 49-7 at 5). It can also be inferred that Mr. Cooke knew about this email, since it was included in the materials Plaintiff submitted to him regarding her proposed demotion, (Dkt. 50-34 at 8; Dkt. 50-35 at 9), and Mr. Cooke stated that he "reviewed [Plaintiff]'s reply" during his independent investigation of the AIB and Dr. Zacher's recommendations to demote Plaintiff, (Dkt. 49-32 at 2).

Mr. Gonzalez also testified that Dr. Zacher was included on the email indicating that Plaintiff's fact finding was insufficient, and that it was "safe to assume" that he communicated the findings of Plaintiff's investigation to her. (Dkt. 53-14 at 7–8.) Moreover, Plaintiff specifically stated in her supplemental responses to Mr. Cooke

that Dr. Zacher's proposed demotion was "all related to retaliation" for her having "perform[ed] and complet[ed] a [f]act[ f]inding [a]ssignment in September 2019 and coming to a summary conclusion and recommendations that [s]enior [l]eadership was not expecting." (Dkt. 34 at 10.) She expressly stated her belief that she "would not be in this position" if it were not for her conclusion in that report. (*Id.* at 11; *see also* Dkt. 35 at 11.) Construing this evidence in the light most favorable to Plaintiff, the court concludes that Dr. Zacher and Mr. Cooke had knowledge of the Leafgreen incident and Plaintiff's Artis fact finding. *See Brungart*, 231 F.3d at 799.

Knowledge of a protected activity, however, is merely a necessary condition for a plaintiff to show that retaliation tainted an adverse employment action—she must also show causation. To do so, Plaintiff relies heavily on what she characterizes as the "[v]ery close temporal proximity" between her protected activity and those decisions. (Dkt. 50 at 20.) *See Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309 (11th Cir. 2023) ("[V]ery close temporal proximity between a protected activity and an adverse action can create an inference of causation."). "Showing that an adverse employment action happens within one month of the protected activity satisfies the causation requirement for summary judgment purposes." *Summers v. City of Dothan*, 444 F. App'x 346, 351 (11th Cir. 2011). Two months is a closer call. *Compare Williams v. Waste Mgmt., Inc.*, 411 F. App'x 226, 230 (11th Cir. 2011) (concluding that a two-month gap is not "very close"), *with Jacomb v. BBVA Compass Bank*, 791 F. App'x 120, 124 (11th Cir. 2019) ("Although this Court has held in a published opinion that a three-month gap is not considered 'very close' such that temporal proximity alone is

- 44 -

sufficient, our case law addressing causation between events that are two months apart consists solely of unpublished opinions with mixed outcomes." (internal citation omitted)).

Plaintiff's reliance on temporal proximity is misplaced. She sent the Leafgreen email on August 20, 2019, and submitted her fact finding report on September 10, 2019. (Dkts. 50-11, 50-12.) She was detailed on November 25, 2019, and was demoted on March 25, 2020. (Dkts. 49-2, 49-3.) Even the shortest time period involved—between submitting her report and being detailed (over seventy-seven calendar days)—is more than two months and is therefore insufficient, on its own, to show causation. *See Williams*, 411 F. App'x at 230; *Boone v. Publix Super Markets, Inc.*, No. 8:18-cv-2523-T-60TGW, 2020 WL 1694163, at *8 (M.D. Fla. Apr. 7, 2020) (determining that a gap of "over two months" was insufficient).

Rather than the dates on which she was detailed and demoted, Plaintiff argues that the relevant date is October 2, 2019, when Dr. Zacher "targeted" Plaintiff "without waiting for an AIB." (Dkt. 50 at 20.) This email was not, however, itself an adverse employment action, and Plaintiff's attempt to argue that it was because it led to the AIB is unavailing because Dr. Zacher had already begun the process of initiating the AIB when she learned of this incident. (*See* Dkts. 49-20, 49-25.) Even if the email were an adverse employment action, it did not indicate that Plaintiff's protected activity played a role in Dr. Zacher's response: the email chain makes plain that Dr. Zacher was responding to a complaint that specifically named Plaintiff. (*See* Dkt. 50-15.) To the extent that Plaintiff was singled out, it was because of her supervisory

status, not her protected activity. (*Id.* at 2 ("[Plaintiff] (as a supervisor) should be held most accountable.").) While Plaintiff submits this email as "unequivocal" evidence of Dr. Zacher's "intent to railroad" Plaintiff, (Dkt. 50 at 16), there is no evidence that this incident played a role in the decisions to detail and demote Plaintiff: the AIB never questioned her about it, and it was not relied on in any of the written documents concerning Plaintiff's punishment. (Dkt. 53 at 16 n.66.)

Unless evidence supports Plaintiff's cat's paw theory, the period between Plaintiff's protected activity and the decisions to detail and demote her was severed by the AIB's intervening investigation, which concluded that Plaintiff bore responsibility for Lake Baldwin's personnel issues. (Dkt. 49-30.) This conclusion was memorialized in the AIB's final report, which expressly found that Plaintiff had "negative interactions with multiple staff," "yell[ed] at people," publicly squabbled with other leadership personnel, and "caused a workplace culture that was disrespectful and not psychologically safe." (*Id.* at 2.) Plaintiff's cat's paw theory fails as to retaliation for the same reasons that it fails as to race discrimination. Accordingly, the AIB's report and investigation severed any connection Plaintiff attempts to draw between her protected activity and the decisions to detail and demote her, so her retaliation claim fails. *See Berry*, 84 F.4th at 1309 (determining that "an employee-relations survey [that] uncovered substantial evidence of misconduct," including reports that the plaintiff "was a 'bully' or 'threatening' or 'abusive' at work," "undercut[] the inference that [the plaintiff]'s complaints caused her termination"); *Duncan*, 734 F. App'x at 641 (affirming grant of summary judgment on retaliation claim where, "even assuming

[the decisionmaker] was actually aware [the plaintiff] had engaged in protected conduct by filing the internal complaint, the undisputed evidence demonstrate[d] [the plaintiff]'s demotion was justified and not motivated by bias").

Plaintiff's other arguments as to retaliatory intent are facially unavailing. Because many of these are duplicated across her claims and have been discussed in greater detail above, the court discusses them only briefly here. The court has already found unavailing Plaintiff's statement that Dr. Zacher has a history of initiating AIBs against African Americans who engaged in protected activity because she does not provide sufficient detail regarding these other cases. *See Smith*, 644 F.3d at 1344. Plaintiff also argues that Dr. Zacher manipulated the evidence presented to the AIB, but the record does not support that assertion. (Dkt. 50 at 21.) Similarly, there is no indication that Dr. Zacher had an obligation to report other physicians' letters of support for Plaintiff to the AIB after it had concluded its investigation such that her failure to do so is evidence of retaliatory intent. (*Id.* at 23.)

Plaintiff also points to many purported failures of the AIB panel—to recall her as a witness "to confront her with the allegations leveled against her," to consider that witnesses were biased against her, and to call witnesses who would have supported her, (Dkt. 50 at 23)—but these failures would only be relevant to her retaliation claim if the AIB panel knew about her protected activity. *See Brungart*, 231 F.3d at 799. Defendant argues that none of the AIB panelists knew about this activity, (Dkt. 49 at 23), and Plaintiff offers no argument in response, (*see* Dkt. 53 at 15–16 & n.64). Moreover, in his declaration, Mr. Scotchlas avers that he knew nothing about the Artis

fact finding and that the AIB's investigation was completely separate from that incident. (*See* Dkt. 49-33 at 4 ("The AIB was only focused on the issue presented at Lake Baldwin. No evidence or discussion connected to the AIB touched on [Ms.] Artis or her fact[ ]finding. I did not—and could not—have known [Plaintiff] participated in the fact[ ]finding.").) A reasonable jury could not infer that the AIB panel retaliated against Plaintiff for protected activity it was unaware of.

Because Plaintiff has adduced no evidence that the decisions to detail and demote her were tainted by a retaliatory intent, Defendant's motion is granted as to this claim as well. *Compare Norman v. McDonough*, 618 F. Supp. 3d 1288, (N.D. Ala. 2022) (determining that the plaintiff had adduced sufficient evidence that retaliation tainted the decision to terminate him where his termination was based on reports made by the plaintiff's supervisors, each of whom had recently been accused of wrongdoing by the plaintiff, resulting in those supervisors being disciplined), *with Terrell*, 98 F.4th at 1357 (affirming the district court's grant of summary judgment as to the plaintiff's retaliatory hostile work environment claim because she did "not show[] that any hostility was causally connected to her [protected activity]"), *and Rosado v. Toro*, No. 3:19-cv-1428-MMH-PDB, 2022 WL 17067390, at *11 (M.D. Fla. Nov. 17, 2022) (finding no causal connection between the plaintiff's protected activity and her non-selection where the plaintiff "produced no evidence that" the member of the selection panel who knew about her protected activity "subjected [her] to any differential treatment during the selection process because of a retaliatory intent").

## CONCLUSION

At the heart of Plaintiff's claims is her belief that the AIB investigation was "a sham, fatally defective, 'show trial,' used to shield Dr. Zacher's animus-driven scheme." (*Id.* at 24.) Plaintiff has not provided evidence that would permit a reasonable jury to infer that this belief is true. Plaintiff may take issue with the AIB's conclusion, but the court need not determine that the decision to demote Plaintiff was good or fair, only whether the evidence supports that it was the result of race discrimination or retaliation. *See Terrell*, 98 F.4th at 1353 ("An employer may act for a good reason or a bad reason so long as it is not an unlawful reason." (cleaned up)); *see also Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions." (quotation omitted)); *accord Tonkyro v. Sec'y, Dep't of Veterans Affairs*, No. 8:16-cv-2419-CEH-AEP, 2024 WL 2846356, at *8 (M.D. Fla. June 5, 2024) ("Although *Babb* changed the applicable causal standard here, it did not change the fact that 'courts do not sit as "super-personnel departments," reexamining the wisdom of business decisions.'" (quoting *Johnson v. Airbus Def. & Space Inc.*, 858 F. App'x 304, 310 (11th Cir. 2021))). Because there is not sufficient "evidence on which the jury could reasonably find for [Plaintiff]," Defendant is entitled to summary judgment. *Weaver*, 169 F.3d at 1321.

Accordingly:

1. Plaintiff's motion (Dkt. 50) is **DENIED**.

2. Defendant's motion (Dkt. 49) is **GRANTED**.

3. The Clerk is **DIRECTED** to enter judgment in favor of Defendant, to terminate any other pending motions and deadlines, and to close this case.

**ORDERED** in Orlando, Florida, on May 1, 2025.

JULIE S. SNEED
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record